This is the first day of a four-day oral argument docket this week, and it's altogether fitting and proper that we begin our arguments this morning on May 1, Law Day USA, where we celebrate the rule of law and rededicate ourselves to the pursuit of a more perfect union. We have three appeals that are scheduled for oral argument this morning, and the first is United States of America v. John Gladden and Linton, and Howard Fornby is here for Appellate Gladden, Joshua Lowther is here for Appellate Linton, Edward Cantor is here for the government, and Mr. Fornby, you may begin your argument. Edward Cantor Good morning, Your Honors. John Gladden Good morning. Edward Cantor I need to get my glasses on. As Your Honors are well aware, Mr. Gladden, over two years ago, was convicted of substantive health care fraud, identity theft, and conspiracy. But in each of these cases, the government has failed to provide any credible evidence whatsoever of his guilt, and has further failed to provide constitutionally adequate notice of how his conduct met the elements of these crimes. Instead, the government's entire case against Mr. Gladden appears to be nothing more than a series of substantiated inferences, insinuations, and innuendos. Well, the problem for Mr. Gladden, as I see it, is that he took the witness stand, and he testified that he did not knowingly participate in any fraudulent activity. He didn't know that any of this activity was taking place, but there were some inconsistencies in his testimony between his direct examination and his cross-examination. He was thoroughly cross-examined, and the jury didn't believe him. Isn't the jury entitled to infer that he knowingly and willingly participated in this fraud, especially when you couple it with the emails, the emails and the testimony of his co-workers, Mr. Whitten and Mr. Rumble. They all testified, they believed that they were being directed to obtain these prescriptions regardless of medical necessity. That seems like pretty strong, overwhelming evidence of guilt. Yes, Your Honor. As far as the jury is concerned, clearly, if the jury always got it right, we wouldn't have this appellate process. And in particular, in this case, in a very complex medical fraud case involving millions of dollars, millions of documents, and at least 20 defendants overall, the jury, not as far as we understand, not a single member of the voting panel in the jury had greater than a high school education. So answering directly, though, the question about whether or not, you know, there was any testimony or any proof of his participation in the conspiracy. The government's witnesses, the government brought two witnesses that were ringleaders of the conspiracy and were testifying for the government pre-sentencing. And both of those individuals who ran the conspiracy testified that John Gladden was never a part of the conspiracy. They brought another witness who was also a ringleader of the conspiracy but was also a whistleblower, and he testified that John Gladden was never a member of the conspiracy and, as far as he knew, never did anything wrong, that John Gladden was only trying to bring attention to the fact that this fraud was going on, not the fraud that John knew was fraud. The jury's entitled to weigh these inconsistent statements by the witnesses, aren't they? Yes, but Your Honor, there was no witness whatsoever that actually said John was part of the conspiracy. What Don Witton and Megan Rumbles said was that John was pressing them to make sales. They felt pressured to make sales, and Don Witton interpreted that solely as, out of all of John's sales representatives, Don Witton interpreted it as she should get the prescriptions for any reason. Right, but let me ask you, what about his own words, though? Wasn't he his own worst enemy there? For instance, his emails, where he said, amazing, of the 27 scripts, only two are for real patients. How about the prescriptions field, along with the appropriate ones? What's your response to that? I think what John was saying there very clearly to his boss, Philip Marks, was that he was telling Philip Marks he wanted that sales rep fired, and Philip Marks testified that John was asking him to fire that sales rep because the sales rep was showing what John He was saying that sarcastically, but Philip Marks testified that he understood that that was exactly what John was asking him to do. But as Judge Wilson said, wasn't that up to the jury then to make that decision when you do have enough circumstantial evidence to support the conviction? Isn't this something that you give deference to the jury's decision? Because of the nature of this trial, what the jury was hearing was about the widespread fraud all throughout the company, and that is true. There was widespread fraud. The problem was that John Glad was not part of that, and in fact, the evidence showed that almost from the very day that John showed up, he was raising issues in emails and company meetings and saying, hey, these prescriptions that are showing up at patients' houses, that the patient didn't understand, what's going on here? John kept saying, we have a customer service issue.  He said that on the one hand, but then on the other hand, with regard to the aggravated identity theft conviction, he says, he told his reps, everybody get a script for yourself, your spouse, your family members, every family member who's on your health plan, get a script, including your minor children who aren't even eligible, who can't even use the SILOPAC. It's not for kids, is it? And the government's home witnesses, though, agreed that that was not only not illegal to get those prescriptions, it wasn't even improper. It's not illegal to get a SILOPAC for a minor? Actually, that was misrepresentation. As the documents that were admitted at trial by the government indicated, SILOPAC was not indicated for children, but under the age of six. That was the restriction, anyone under the age of six. People that we're talking about here, Dawn Whitten's daughter, Emily, was 12 at the time. Dawn Whitten admitted to the government and their own investigator admitted that her daughter actually wound up using that particular medication to treat a rash that her daughter had at the time. So Dawn Whitten believed that it was an appropriate medication as a mother and fully knowledgeable about what the restrictions were for these products. You had an opportunity to present all these theories and explanations to the jury, though, didn't you? Yes, Your Honor, I did. And yet, I think that to a large extent, this is one of those cases where there's such a large widespread fraud going on in the company that you have the where there's smoke, there's fire. They weren't listening at all to any of the testimony and the fact that we brought up the testimony that all of the government's witnesses agreed John wasn't part of the conspiracy. Let me ask you a question about a different subject regarding the conviction under 18 U.S.C. Section 1028A. Do you contend that the Dubin v. United States case pending before the Supreme Court has any bearing on this case? You're talking about identity theft? Yes. In this case, Your Honor, that case does not apply to John Gladden because what he's being charged with is not the identity theft of a doctor. He's being in charge with the identity theft of Don's daughter. And it's unclear how in the world he has any connection to that. He never told her to get a prescription for her daughter. He said broadly to all the sales reps, you need to be able to do this, but only Don Witten. Don was the only person who actually did so. So you don't think we should await the Supreme Court's holding in that case before we decide anything about that claim? No, Your Honor, because I don't think that it applies at all here because he's not being according to count number 84, the government is accusing him of stealing Emily Witten's identity and not the physician, which is what the issue is in that particular case. Let me also switch with respect to the forfeiture. What is your response to the government's argument that Gladden's salary is the proper subject of forfeiture because for the fraud at Global, he would not have received the compensation he did? There's no question, Your Honor, that the only evidence that the government has brought regarding John Gladden's guilt are three prescriptions that Don Witten forged for herself and her two children. All the other prescriptions that were generated under John's watch, that generated his income, the government is not accusing him of anything untoward as far as all of that. So we would say that really the only thing that really should matter here, the only evidence of any guilt on his part were three prescriptions and possibly their retails. All right, Mr. Fornby, you have reserved some time for rebuttal. Thank you. Thank you, Your Honor. And we'll hear from Mr. Lowther. Good morning, Your Honors. Counsel for the government, Mr. Fondy. May it please the Court. The sole issue in the appeal regarding Ms. Linton is whether the government proved beyond a reason without her intent to defraud. As the Court's aware, intent to defraud not only includes the government's proof that there was an intent to deceive, but there's also an intent to cause harm, or in this case, a loss. Ms. Linton concedes that the government proved a health care fraud conspiracy overall, but the government did not prove that she was a knowing and willful participant in that conspiracy. And even for purposes of the Court's de novo review, when considering the evidence in the light most favorable to the conviction and drawing all inferences in favor of the government, that still doesn't stand based on the witness testimony that Ms. Linton referenced in her brief. Well, let me ask you, how about the interaction with Jamie Mays about the scar patch that had been discontinued? Couldn't a jury infer that Linton knew that Mays had never received the patch and was billing for a medically unnecessary product? Yes, Your Honor, a jury could infer that, but if we consider Mr. Mays' direct testimony, because Mr. Mays cooperated with the government, he was a government witness, and I asked him directly, did you have any conversations, and I don't want to go far from your question, but just to set the foundation, the government's theory was we're not collecting co-pays, we're changing compound ingredients, and we're setting automatic refills. And I asked Mr. Mays, did Ms. Linton discuss that with you? Yes, she did. I told her it was acceptable in the industry. So considering that testimony, I think that it was too much of an inference for the jury to believe that she actually knew there was a health care fraud specifically based on the prescriptions for items not medically necessary. So Mr. Mays also testified, since we're there, he was a pharmacist, he was a co-owner of Global, he was a co-conspirator, he was a pharmacist in charge of Global, and most importantly, he was Ms. Linton's direct supervisor. So again, when you look at what his position was, he also testified that she had no background in compounding pharmacy whatsoever, she wasn't a pharmacist or a pharmacy tech when she started at Global. Well, she altered prescriptions and showed others how to change these prescriptions in order to get the more expensive, reimbursed for the more expensive prescriptions. I mean, there's a ton of evidence to support that. At the direction of Mr. Mays and one other co-conspirator who did not testify at trial, Mr. Adams, and it's not a defense, obviously, to say I committed a crime because somebody told me to do it, and I was following directions, but it is a defense, and we respectfully submit it's a defense in this case, when, again, you're not a knowing and willful participant. So the conduct itself isn't illegal. Obviously, the conduct's only legal when accompanied with a specific intent to defraud. What about the evidence of changing the address of patients to Global's owner so that Global wouldn't lose the revenue and the patients wouldn't know? That doesn't require any pharmaceutical knowledge on her part, does it? This is true, and unfortunately, I'm confined by the facts, but that was the same at the direction of Mr. Adams as opposed to Mr. Mays. So where a jury could, and I'm not talking to a legal sufficiency standard, where a jury could infer that would be intent to defraud, the government didn't specifically prove that directly because of the testimony of Mr. Mays, and the circumstantial support for that would be through the other witnesses I mentioned in the brief. Thank you. Thank you, Mr. Lather, and we'll hear from Mr. Cantor on behalf of the government. Thank you, Your Honor. My name is Ted Cantor. May it please the Court. We asked this Court to affirm the judgments against John Gladden and Jessica Linton for two reasons. First, more than sufficient evidence was adduced at trial to find them guilty on each of the charged counts, and second, the Court did not commit clear error in calculating the amount of restitution and forfeiture owed by Mr. Gladden. Unless the Court prefers otherwise, I'll plan to address Mr. Gladden's arguments first before turning to the arguments raised by Ms. Linton. Mr. Gladden doesn't dispute that there was a widespread conspiracy to defraud at Global. He acknowledged that in his opening statement. He took that position throughout trial, and he acknowledges that here on appeal. So the question is, is whether he knew about that conspiracy and whether he knowingly and voluntarily joined in it. And the answer to both of those questions is yes. First, with respect to the knowledge element, Mr. Gladden testified in his own defense. And on direct, he acknowledged that he, being someone with almost a decade and a half of pharmaceutical sales experience, almost immediately began to recognize red flags when he started at Global. And the first red flag, according to him, in response to questions from his counsel, was the conduct of Stephen Boyd, a sales representative who worked for him. And according to Mr. Gladden, Mr. Boyd was getting an inordinate number of prescriptions for himself and his family members. And the jury saw multiple emails that he sent to his supervisor, which he commented on the dozens of prescriptions Boyd was getting for himself and his family, while simultaneously only getting two or three real or actual prescriptions. In that email, he called it an amazing feat. But during his direct testimony, he viewed that as exploiting the system, according to Mr. Gladden. And so from that, the jury could certainly infer the fact that he knew about the essential nature of the conspiracy at Global, which involved sales representatives getting prescriptions for high-reimbursing products for themselves and for their family. So turning to whether he knowingly and voluntarily joined in that conspiracy, again, the evidence was more than sufficient to find that that was the case. First, the jury heard that his sales representatives throughout his tenure at Global, including sales representatives that he recruited to the company, continued to get prescriptions for themselves and their family members. In addition, the jury saw the emails that he sent to his sales representatives in July of 2015, directing them to get, quote, personal scripts. And focusing on Government Exhibit 162, I think it's important to note what he specifically points out in that email. There's the fact that it's covered by Blue Cross Blue Shield of Alabama, the fact that it will count towards your quota and you'll get sales credit for it, and the fact that it's high-reimbursing. He doesn't specifically reference what these products even do. And the jury heard from multiple sales representatives who received that email that they understood Mr. Gladden to be directing them to get medically unnecessary prescriptions for themselves and their family members. Well, you know, Mr. Gladden's response is that he was under no obligation to use the phrase medically necessary in each and every email. How do you respond to that? That's true. There is no requirement that he say medically necessary, but here the standard is, you know, viewing those emails in the light most favorable to the government and in conjunction with the testimony of the people who received those emails who understood him to be saying, we don't care about medical necessity, that that is sufficient to satisfy the government's burden. And I'll just note, it's not just the two sales representatives who testified after receiving those emails. Two district managers who pled guilty to the same conduct said that when they sent similar emails, they weren't indifferent to medical necessity. And that's what Philip Marks said as well, who is the national sales director, who sort of set the ball rolling for this. And then, of course, you have Government Exhibit 169, where after Don Witten raises concerns about getting additional prescriptions for pain products because there's no medical documentation to that effect and wanting to avoid drawing red flags to herself and the doctor, his response is not, well, you shouldn't be getting products that, you know, you have no medical documentation for. It's not you should call the call center and reverse those because you don't have any documented need for them. It's have your buddy write a script for you. And the buddy here, I think what's particularly relevant, this is an endocrinologist. It's somebody who has a diabetes practice. And Mr. Gladden, according to Ms. Witten's testimony, was aware of that fact. He has no business writing SILIPAC. He's not a dermatologist or a general practitioner, and he's directing her to get a prescription for that. And then I think most importantly, as your honors have flagged, Mr. Gladden testified in his own defense at trial, and he was subject to a vigorous cross-examination where numerous contradictions that go to the heart of the government's case were exposed, and the jury was entitled to disbelieve him. And they obviously did, and for all those reasons, the evidence was sufficient to find that he committed the charged crimes. Let me move to the mail fraud for a moment here, the substantive mail fraud conviction. The government, according to the 11th Circuit's decision in United States v. Wheeler, the government has to prove that the defendant had the intent to deceive, but also that they intended to harm the victim. Can you tell me here how the victim was harmed in this case? Yes, your honor. So Emily Witten, the subject, my recollection is that the substantive mail fraud count also dealt with Emily Witten, and as was discussed during the prior questioning, she's somebody who was 12 years old at the time of this, and the Silipac leave behind that was entered into evidence indicated that it was contraindicated for children. The argument on the other side was that Jamie Mays, the corrupt pharmacist at Global, was unwilling to write that for individuals under 6 years old. There was also testimony from Stapp Harrison where he refused to write it for somebody under 10 years old. But the jury could certainly find that based off of the fact that it was contraindicated for children, that a reasonable pharmacist wouldn't prescribe it to somebody who was under 12 years old. Thank you. And turning to Ms. Linton's argument, Ms. Linton was not a low-level employee or somebody who came to Global without relevant experience. She was recruited by Jeremy Adams to come to Global to run the Clearwater Call Center from a durable medical equipment supply company where she had worked with Mr. Adams and a number of other future Global employees. And the Clearwater Call Center is important because that's really the epicenter of the fraud in this case. It's where the practices with respect to copay collection, automatic refills, the substitution of products, all of that emanated from the call center that she managed. And there was testimony from a number of witnesses that she was repeatedly warned about Global's billing practices. Judith Reynolds testified that she attended a meeting where she raised concerns. Jeff South testified that he told her they needed to be collecting copays. There were emails from Reynolds and Stapp Harrison, a pharmacist at Global, where concerns that they raised were forwarded to Ms. Linton. Furman Alfonso, a biller who worked for Ms. Linton and who had previously worked with her at CCS Medical, said that he raised concerns about Global's practices. So the testimony from all of those individuals over the course of the trial should have put her on notice that the practices were improper. But even if that wasn't the case, there was significant evidence that these are not the types of allegations or conduct that you need to be a doctor or a pharmacist or somebody with medical training to understand are improper. And the best example of that is the prescriptions that were directed to Jeremy Adams' home for three individuals, Doris Edenfield, Donald Edenfield, and Derek Wester. And the testimony at trial is that the prescription, that the fees that were reimbursed for those products alone was $1.5 million. And you don't need to be a pharmacist or somebody with medical training to know that you shouldn't redirect prescriptions to the home of the CEO so you can keep billing for them. I know you moved on to Linton, but I still have a question on Gladden, on Mr. Gladden, on the forfeiture. And I'd like to know what your position is with respect to whether this case can be distinguished from the Moss case. In the Moss case, the court noted that the record didn't reveal a single claim that was both for legitimate services and properly billed. And here you have Mr. Gladden's salary isn't some of his salary earned for legitimate services, and here the government's trying to forfeit the entire amount. What's your response to that? So my understanding is the argument that was raised by Mr. Gladden is that it's a little bit different than that. And I'm not familiar with the case, so I'm happy to submit a letter to the court addressing it. I think what he said was that it was punitive. That's the argument, the forfeiture is punitive in a lot of the amounts involved. Yes, Your Honor, and I think that the record here on clear air is that his salary during his time at Global, the amount he was reimbursed was $167,000. The court determined that not all of that would be subject to forfeiture. The $10,000 amount was carved out of that. And the basis was that from the start, based on his testimony, almost immediately after starting at Global, he recognized red flags and that he wouldn't have earned those amounts but for his misconduct. But the $10,000 that was subtracted by the district court represents what money that he received before he started working. What did that $10,000 represent? It wasn't while he was working there, right? That's correct. My understanding is that it was a signing bonus or some funds that were prepaid to him. Okay, so the balance then. It seems to me that the district court could very easily have separated out commissions he received for legitimate sales from commissions that he received from illegitimate sales. The court could have done that, couldn't it? I think in theory the court could have done it, but I would note that we're here on a clear air standard and that the mechanism that he used to come up with the forfeiture amount is consistent with the testimony that Mr. Gladden offered at trial. What about the restitution then? I mean, it seems like the insurance company's got a windfall. The district court ordered Witten and Rumble to pay restitution for the prescriptions they billed. And so Witten ordering Gladden to pay restitution for the same prescriptions results in a windfall to the insurance companies for those prescriptions? My understanding, Your Honor, is that they were all jointly and severally responsible for those. And I think in any event, the loss amount here, as calculated by the court at trial, was $2.2 million. And the court took a very conservative approach in calculating the amount of restitution based just off the trial testimony of Megan Rumble and Dawn Witten that the products that they got prescriptions for were medically unnecessary. And I think just following up quickly on two points that were made in the reply brief for Ms. Linton, I would just note that Angie Nelson testified that Autumn Nelson was her younger daughter. That's in the record at docket entry 409, page 191.16. And so that message was concerning her three-year-old daughter at the time. And I'd also note that with respect to the soliciting of backdated prescriptions, Government Exhibit 100 is an email to Jeremy Adams from an administrative assistant. These silo pack prescriptions, I mean, that resolved the case. What did they actually, is there evidence that the creams were actually used? Your Honor, I think that there's been representations by counsel that that's the case. That's not my recollection based on the record. And I'm not familiar with any docket site that reflects that. There's no testimony from any witnesses that the silo packs were actually used? That's not my recollection. And I think my recollection of Ms. Witten's testimony is that there was no scars or anything that would require that product for her children. And if there's no other questions, we ask that the Court affirm. All right. Thank you, Your Honor. Thank you, counsel. Mr. Fornby. Thank you, Your Honor. With regard to Dawn Witten's prescriptions, you just had the question of whether there was any evidence that these were used. And in fact, Dawn Witten agreed in her statement to the government on May 18, 2018, that her daughter did use, in fact, her children did use the products that he got for them. And their own investigator admitted on the stand that Dawn Witten told her that all of her family members had used all the products she got. So, in terms of medical necessity, every single product that was generated as a result of John's email was, in fact, medically necessary on the face of it. Also, the government's own witnesses testified that it was absolutely proper. Now, if there was, of course, if it was used and the doctor didn't prescribe it, then it wasn't medically necessary. Your Honor, those are two different issues entirely. Medical necessity, if a person is going to use a drug that has no recreational value, no street value, the only reason, by common sense, that a person would actually try that product on themselves is if there was, in fact, a medical need for it. All right. Thank you, counsel. Mr. Lowther? Well, Mr. Lowther's going to rebuttal. Your Honor, at the risk of losing sight of the issue for the details, I would like to underscore that Judith Reynolds was an experienced pharmacist, Steph Harrison, a PharmD, who had actually worked at a compounding pharmacy that was under federal investigation before he went to global. Both of these pharmacists were very experienced, and they're very aware of the problems, if you want to categorize it like that, in the compounding industry. It took both of them six months and more than six months, respectively, to actually figure out that there were irregularities at global. So when you look at pharmacists with their level of experience and compare that with Ms. Linton, and again, I said she came here with no compounding experience is exactly what I said, and that wasn't a dance around to the issue. She worked for Mr. Adams in administrative capacity at a durable medical equipment company. So regardless of the fact that it was DME, she came to global completely without experience for compounding. Thank you. All right, we have your arguments. Thank you, counsel.